UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROOSEVELT PETTIFORD,

                Petitioner,

v.                                                          CASE NO. 10-14781
                                                            HONORABLE GEORGE CARAM STEEH
DAVID BERGH,

                Respondent.
_____/

## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS
## AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Roosevelt Pettiford has filed an application for the writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  The habeas petition challenges petitioner's

Wayne County convictions for first-degree (premeditated) murder, Mich. Comp. Laws §

750.316(1)(a), felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and

possession of a firearm during the commission of a felony (felony firearm), Mich. Comp.

Laws § 750.227b.  Respondent David Bergh urges the Court to deny the habeas

petition on the basis that the state court's adjudication of petitioner's claims was

objectively reasonable and is not contrary to, or an unreasonable application of,

Supreme Court precedent.  Having reviewed the pleadings and state court record, the

Court agrees that petitioner's claims do not warrant habeas corpus relief.  The habeas

petition, therefore, is denied.

# I.  Background

## A.  The Facts

Petitioner was tried before a jury in Wayne County Circuit Court where the

evidence established that:

> [t]he victim, Vinson Lamont Ellington, was shot to death in Detroit on November 1, 2005.  The shooting occurred between 11:30 a.m. and noon, at a gas station located near the intersection of Oakland Street and East Grand Boulevard.  The victim was pumping gas when a lone assailant killed him with multiple gunshots.  Chief Wayne County Medical Examiner Dr. Carl Schmidt testified that the victim endured 11 gunshot wounds, including two to his face, two in his neck, two to the back of his right shoulder, and one each to his upper chest, right lower back, right hip, right buttock, and left forearm.  Schmidt opined that no evidence of close-range gunfire existed on the victim's body, and that "a high velocity weapon was used."[1]

> Several eyewitnesses offered at trial their recollections of the November 1, 2005 shooting. Ninth-grade teacher LaDonna Morrow and one of her students, Taylor Hanserd, testified that while driving west on East Grand Boulevard toward a red traffic light, they heard three gunshots emanating from a gas station on the right side of the road.  Morrow and Hanserd recounted that after Morrow stopped at the traffic light, they saw the victim pumping gas into a station wagon, and a dark green Cadillac Escalade parked on the opposite side of the gas pumps. Morrow and Hanserd similarly described that they also saw an African-American man wearing a black, hooded coat; they watched as the victim fell to the ground, the hooded man moved closer to the victim, within several feet, and continued shooting a gun at the victim,[2] then ran behind the gas station and into the passenger's seat of a green 1997 Chevrolet conversion van with tan or beige stripes.  Neither Morrow nor Hanserd could describe the shooter's face because his hood obscured it, and neither heard any verbal exchange between the victim and the shooter.

---

[1]  The prosecutor presented several police witnesses to document the facts that the police never recovered the weapon used by the assailant, the van driven away by the assailant, or any usable fingerprints on fired casings collected at the gas station on November 1, 2005.

[2]  Morrow estimated that "altogether I may have heard nine, maybe thirteen shots," while Hanserd guessed that she heard at least six or seven.

Both Morrow and Hanserd saw an African-American woman on a sidewalk across the street from the gas station running away from it, the Escalade pull away from the station, and a white Detroit police car that had been parked at or near the gas station drive away from the scene after the shots rang out. Morrow then drove away and she or the student called 911.

Evan James Nayfa testified that on November 1, 2005, he lived in a second-floor apartment across the street from, and "[j]ust east of," the East Grand Boulevard gas station where the shooting occurred. Nayfa recalled that within 15 minutes of noon, he heard three gunshots that prompted him to look out his window toward the gas station. From 30 or 40 feet away, Nayfa "saw a station wagon at the pump" nearest his vantage point, "the victim as he was falling to the ground," and "the shooter at the front of [the victim's] vehicle." According to Nayfa, the assailant, an African-American male who wore a black coat with its hood raised, "was running up towards [the victim], and he kind of stood in a stance at the front of the victim's car. . . .  And I'd say from there he shot about six or seven more times" with a "very large" "automatic weapon."[3] Nayfa described that the shooter then fled behind the gas station and into the driver's side of "a green conversion van" with "tan decals and a raised roof"; Nayfa disbelieved that the van contained any other occupants.[4] "A couple minutes" later, Nayfa and his roommate ventured across the street, where the victim laid on the ground, silent and unmoving, and where many other people they did not know gathered around. Nayfa thereafter encountered the police and participated in a photographic lineup at the police station; Nayfa could not identify with certainty anyone as the shooter, but suggested that two of the photographs most resembled the shooter; a photograph of defendant was one of the two that Nayfa selected.[5]

The prosecutor presented evidence that one eyewitness to the shooting had identified defendant as the victim's assailant. Yolanda Browning testified that she had grown up in the same area of Detroit as the victim and defendant, and had known them both for at least 20 years.

---

[3] Nayfa estimated that the assailant approached within 8 to 10 feet of the victim, and that in total he heard 13 gunshots.

[4] In Nayfa's estimation, the green van "was parked in behind the gas station in a way that was premeditated" because it "ha[d] been backed in behind the gas station."

[5] Nayfa's roommate, offered testimony similar to Nayfa's in most respects. Nayfa's roommate also attended a photographic lineup on November 1, 2005, but could not identify the shooter because he had worn a dark hood covering his head.

Browning recounted that on November 1, 2005, she lived a couple of blocks away from the East Grand Boulevard gas station, and that she had started walking toward the gas station that morning intending to meet the victim, whom she had called requesting to purchase crack cocaine. Browning conceded at trial that she had heard some gunshots while walking toward the gas station, but insisted that she had not viewed any portion of the shooting, or any people or vehicles around the gas station, because the shots prompted her to "turn[ ] around and r[u]n" home.

At trial, however, Browning confirmed that in a statement recorded by the police on November 1, 2005, her initials appeared alongside the following details: "Roosevelt did it [the shooting]"; Roosevelt's last name was Pettiford; Browning replied affirmatively to the police question, "Did you actually see Roosevelt fire the gun?"; Browning described Roosevelt as a "[b]lack male, thirty, five nine, a hundred and seventy-five pounds, medium complexion, short Afro, light [mustache] with black marks on his face and a big ass head"; Browning had known defendant all her life, and believed he lived "[o]n Rosedale at Oakland about three or four houses off the corner with the white picket fence . . . south side of the street"; that she "saw [the victim] going back to his car from the gas station at Oakland and East Grand Boulevard"; "[t]hat's when I saw Roosevelt shoot [the victim]"; that defendant had shot the victim from "[c]lose range, he just walked up on him and started shooting"; that defendant had fired his first shot while pointing a gun "[a]t [the victim's] face. It looked like it could have been his eye"; and that she had an "open" view of the shooting from about 25 feet away because she "could see straight to the East Grand Boulevard."[6]

Scott Shea, a Detroit police homicide officer, testified that he participated in a November 7, 2005 follow-up interview of Browning, precipitated when a colleague of Shea's telephoned Browning to arrange the discussion. Shea recounted that he first asked Browning "if she knew the gentleman that she named in her prior statement," and that Browning responded affirmatively, without hesitation or qualification. Shea described that the officer-in-charge of the case then showed Browning a mug shot photograph of defendant and inquired (1) whether she knew "this person," to which Browning responded, "Yeah, that's Roosevelt," (2) how she knew defendant, which she answered, "We went to school together. I've been knowing him my whole life," (3) whether she saw defendant on November 1, 2005, to which she replied, "Yes," "I saw him at the gas station at Oakland and East Grand Boulevard," (4) "what did

---

[6] Detroit police homicide investigator Myron Love testified that he interviewed Browning in the early afternoon of November 1, 2005, and similarly described the contents of her statement that day.

Roosevelt do[,]" which she answered, "When he shot [the victim]," (5) if she had witnessed the shooting, and Browning responded, "I saw the first shot and then I took off running," "Roosevelt was shooting and he shot [the victim]," (6) "did you see Roosevelt with a gun[,]" which she answered, "Yeah, but I don't know what type of gun it was," and (7) whether anyone had accompanied defendant at the gas station, to which she replied, "No." Shea added that Browning then reviewed the statement he had handwritten and signed both pages. Shea denied that Browning ever had suggested to the police that she could not see the shooting clearly because she was not wearing her glasses, or that she had fabricated her summary of events to gain a measure of revenge against defendant for abusing her niece.

Detroit police homicide officer David Moore also testified about his interaction with Browning approximately a week after the shooting. Moore recalled that at police headquarters he talked for about 35 or 45 minutes with Browning, who had arrived alone and voiced concern regarding her participation in defendant's case, specifically "[t]hat she had heard conversations throughout the neighborhood that she was coming down to the police station and talking too much," felt "concerned about any kind of repercussions or anything like that." According to Moore, he and Browning also discussed the November 1, 2005 shooting at headquarters, then spent five or 10 minutes together revisiting the scene of the shooting. Moore described that Browning again recounted with specificity her unequivocal observations of the shooting, including that defendant had shot the victim near the gas pumps. Moore denied that Browning thereafter reported to police any qualifications of her shooting account.[7]

_____

[7] Multiple witnesses testified at trial concerning Browning's contact with defendant's girlfriend between her early November 2005 statements to the police and her detention as a material witness in March or April 2006. Browning repeatedly denied ever feeling influenced by defendant or his family or friends, or discussing her preliminary examination and trial testimony with defendant's girlfriend, Crystal Cowan. The prosecutor called Lora Baldwin, a 36th District Court security officer present at defendant's January 3, 2006 preliminary examination, who recounted her observations that after Browning left the witness stand at the examination, outside the courtroom she "met up with a light-skinned lady [Cowan]," who got "close to" Browning and spoke to Browning in "[a] little aggressive" tone of voice. The prosecutor also inquired of Baldwin, "And had you been in the courtroom when the Court admonished that there was to be no contact between friends and family members of the defendant and the witnesses[,]" to which Baldwin replied, "Yes, I was." The prosecutor additionally elicited testimony from Detroit police officer Anthony O'Rourke, who described that on March 22, 2006, he had gone to investigate potential witness tampering at 520 Smith Street in Detroit. O'Rourke recalled that at 520 Smith Street, he identified and spoke with

Thomas Hill testified that he had known both the victim and defendant for more than 20 years, that they all resided in the same neighborhood, and that he had dated defendant's sister.  Hill conceded that he had criminal convictions and an addiction to crack cocaine, but denied that anyone had promised him any type of leniency in exchange for his trial testimony.  While incarcerated on December 12, 2005, Hill wrote and sent a letter to homicide investigators inquiring whether the victim in fact had died, and suggesting that if so, Hill might have information relevant to a police investigation; Hill specifically mentioned in the letter that during a conversation with the potential suspect, he had "asked [Hill] to hit [shoot or kill]" the victim, that Hill knew the suspect to have "drugs and [a] gun," and that Hill could provide additional information.

When a police sergeant came to interview Hill on December 15, 2005, he first advised him that someone had killed the victim, then asked what Hill knew about the victim's shooting.  Hill testified that he related to the sergeant the following details about defendant: as defendant drove him around one day past a local barber shop, they passed the victim on the sidewalk and defendant became upset and announced "I'm going to get the M.F.," mentioning in explanation only that he and the victim "had some words" and that he "had a problem with all of [the victim's crew/friends]"; defendant inquired of Hill "what if I gave you some money to hit [the victim]"; defendant also expressed, "I'm going to have that mother fucker hit or I'm going to kill him myself"; when Hill expressed disinterest in killing the victim, defendant called him a "bitch" and "a coward, and . . . started telling [Hill] how easy it was to be able to do somebody"; defendant theorized, "All you have to do is hit the [crew] leader [the victim] and the rest of them will fall."  Hill recalled that he additionally told the sergeant that he had seen guns at defendant's three Detroit houses and the residence of defendant's girlfriend.[8]

Defendant presented two alibi witnesses.  Defendant's cousin, Gloria Pettiford, testified that she and her mother went to a Detroit residence on Rosedale Street around 11:30 a.m. on November 1, 2005.  Pettiford recalled that she spoke with defendant at the Rosedale residence for about 20 minutes, then at about 12:00 p.m. or 12:10 p.m., she drove defendant to a Coney Island restaurant where they had lunch.  According

Browning, who resided in the lower flat, and also identified and spoke with Cowan, who resided in the upper flat.

[8]  The prosecutor also played for the jury portions of several recorded telephone calls that defendant had initiated from jail after his arrest. . . .

-6-

to Pettiford, she returned defendant to the Rosedale residence at around
1:40 p.m. Pettiford acknowledged that she had told no one about
defendant's alibi until a couple weeks before his trial commenced.

Patricia Crenshaw, defendant's aunt, offered similar details
regarding her November 1, 2005 trip to the Rosedale Street residence
with her daughter, Gloria. Crenshaw specifically related that she and her
daughter had spoken with defendant at the Rosedale residence for 15 or
20 minutes, that she then entered the house, and that around noon or
shortly thereafter she observed out a window that her daughter drove
away with defendant. Crenshaw conceded that she also failed to report
her observances to either the police, prosecutor, or defense counsel until
two or three weeks before trial.

People v. Pettiford, No. 273369, 2009 WL 529211, at *1-*4 (Mich. Ct. App. Mar. 3,

2009) (unpublished) (footnotes in original).[9]

## B. The Verdict, Sentence, Motion for New Trial, and Appeal

On August 4, 2006, the jury found petitioner guilty, as charged, of first-degree

murder, felon in possession of a firearm, and felony firearm. The trial court sentenced

petitioner to two years in prison for the felony firearm conviction, followed by concurrent

terms of three to five years for the felon-in-possession conviction and life imprisonment

for the murder conviction.

Petitioner appealed as of right and then moved to remand his case to the trial

court so that he could file a motion for new trial based on his trial attorneys'

performance. The Michigan Court of Appeals granted the motion for a remand, but

retained jurisdiction. On remand, the trial court held an evidentiary hearing and denied

petitioner's motion for new trial. The Michigan Court of Appeals then affirmed

petitioner's convictions in a lengthy per curiam decision. See Pettiford, 2009 WL

_____

[9] This Court abbreviated footnote 8 because it contains information that is not
relevant to petitioner's habeas claims.

529211.  On September 28, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  See People v. Pettiford, 485 Mich. 894; 772 N.W.2d 363 (2009) (table).

## C.  The Habeas Petition and Answer to the Petition

On December 2, 2010, petitioner filed his habeas corpus petition through counsel.  He argues that:  (1) there was no sworn testimony at trial to sustain the verdict, (2) the prosecutor violated his constitutional rights by placing before the jury a letter from a non-testifying individual, (3) he was denied his right to counsel of choice, (4) the trial court made prejudicial comments about an alibi witness's testimony, (5) the police suppressed evidence, (6) the prosecutor (a) misrepresented the evidence, (b) argued facts not in evidence, and (c) violated the trial court's ruling, and (7) his trial attorneys were ineffective.

Respondent David Bergh urges the Court through counsel to deny the petition. He argues that portions of petitioner's second claim are procedurally defaulted and that petitioner's other claims lack merit or are not cognizable on habeas review.  A procedural default is "a critical failure to comply with state procedural law." Trest v. Cain, 522 U.S. 87, 89 (1997).  It "is not a jurisdictional matter," id., and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." Hudson v. Jones, 351 F.3d 212, 215 (6th Cir. 2003).  The Court excuses the alleged procedural default in this case, because petitioner's claims do not warrant habeas relief, and it is more efficient to proceed directly to the merits of the second claim than to analyze whether portions of the claim are procedurally defaulted.

-8-

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for

persons in state custody is provided by 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  Harrington v. Richter,

__ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, the Court may not

grant a state prisoner's application for the writ of habeas corpus unless the state court's

adjudication of the prisoner's claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an
>        unreasonable application of, clearly established Federal law,
>        as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable
>        determination of the facts in light of the evidence presented
>        in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court
> may grant the writ if the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II).  "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application must

also be unreasonable."  Id. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court

rulings,' <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L.Ed.2d 481

(1997), and 'demands that state-court decisions be given the benefit of the doubt,'

<u>Woodford v. Visciotti</u>, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L.Ed.2d 279 (2002) (<u>per

curiam</u>)."  <u>Renico v. Lett</u>, 559  U.S. 766, 773 (2010).  "A state court's determination that

a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision."  <u>Harrington v. Richter</u>, 131 S.

Ct. at 786 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  "[E]ven a

strong case for relief does not mean the state court's contrary conclusion was

unreasonable."  <u>Id</u>.  (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)).  To obtain a

writ of habeas corpus from a federal court, a state prisoner must show that the state

court's ruling on his or her claim "was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  <u>Id</u>. at 786-87.

### III.  Discussion

### A.  The Sufficiency of the Evidence

The first habeas claim challenges the sufficiency of the evidence supporting

petitioner's murder conviction.  Petitioner asserts that the prosecution did not present a

single witness linking him to the killing through sworn testimony at trial.  There was no

physical or scientific evidence linking petitioner to the shooting, and he contends that

the prosecution built its case on Yolanda Browning's untruthful out-of-court statements

to the police and the suspect testimony of jailhouse snitch Thomas Hill.  The Michigan

Court of Appeals adjudicated this claim on the merits and concluded that there was

abundant admissible evidence showing that petitioner premeditated and deliberated the victim's murder.

### 1. Clearly Established Law

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). "After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphases in original).

"A sufficiency of the evidence claim is a 'steep climb' . . . ." United States v. Ross, 703 F.3d 856, 882 (6th Cir. 2012). Federal courts

> apply two layers of deference in reviewing habeas claims challenging evidentiary sufficiency. McGuire v. Ohio, 619 F.3d 623, 631 (6th Cir. 2010) (citing Brown v. Konteh, 567 F.3d 191, 204–05 (6th Cir. 2009)). "First . . . [they] must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Brown, 567 F.3d at 205 (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979)). "Second, even were [they] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [they] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." Id. (citing 28 U.S.C. § 2254(d)(2)).

Moreland v. Bradshaw, 699 F.3d 908, 916-17 (6th Cir. 2012), cert denied, __ S. Ct. __, No. 12-10405, 12A770, 2013 WL 2255771 (U.S. Oct. 7, 2013).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In Michigan, the elements of premeditated murder are (1) the defendant killed the victim and (2) the killing was "willful, deliberate, and premeditated." People v. Bowman, 254 Mich. App. 142, 151; 656 N.W.2d 835, 841 (2002) (quoting Mich. Comp. Laws § 750.316(1)(a)).

**2. Application**

The only issue in dispute here is whether petitioner killed the victim. At trial, petitioner asserted through two alibi witnesses that he was elsewhere at the time of the crime. The prosecutor, however, presented evidence that Yolanda Browning knew petitioner and informed the police shortly after the shooting that she saw petitioner shoot the victim. Although Ms. Browning later recanted her statements to the police, she admitted at trial that she initialed a statement in which she claimed to see petitioner shoot the victim.

Petitioner argues that there was a lack of evidence connecting him to the shooting because the trial court instructed the jury that a witness's prior inconsistent statements could not be used as substantive evidence except in two circumstances not applicable to his case.[10] The Michigan Court of Appeals, however, determined that the

_____

[10] The two circumstances mentioned by the trial court were (1) a witness's testimony that her prior inconsistent statements were true and (2) the earlier inconsistent statements were given under oath subject to the penalty of perjury. (Trial Tr. Vol. VIII, 127-28, Aug. 2, 2006.) Neither circumstance applied to Ms. Browning's

testimony of other witnesses regarding Ms. Browning's out-of-court descriptions of the shooting was not hearsay and therefore was admissible as substantive evidence. Indeed, Browning's prior statements were statements of identification, and because she testified at trial and was subject to cross-examination, her prior statements were admissible as substantive evidence. People v. Malone, 445 Mich. 369, 370, 384-85; 518 N.W.2d 418, 419, 425 (1994). The state court's interpretation of state law binds this Court sitting in habeas corpus. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (citing Estelle v. McGuire, 502 U.S. 62, 67–68 (1991), and Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)).

There was additional evidence that Evan James Nayfa observed the shooter from his apartment across the street from the shooting. He picked petitioner's picture and another person's picture from a photo array and said that they looked like the shooter.

Thomas Hill testified that he knew petitioner for over twenty years and that one day petitioner said he wanted to have the victim "hit," which meant murdered or shot, because petitioner and the victim "had some words or whatever." (Trial Tr. Vol. III, 128, 139-40, 147, July 19, 2006.) Although motive alone is insufficient to establish the elements of first-degree murder, People v. Sowders, 164 Mich. App. 36, 42; 417 N.W.2d 78, 81 (1987) (citing People v. Gill, 43 Mich. App. 598, 603; 204 N.W.2d 699 (1972)), Hill also testified that petitioner had access to guns and had asked Hill to shoot or kill the victim. Petitioner tried to convince Hill how the murder could be accomplished, and

---

prior inconsistent statements.

-13-

he even threatened to kill the victim himself.  (Trial  Tr. Vol. III, 139-40, 145-47, 151, July 19, 2006.)

Petitioner claims that Hill's testimony was "highly suspect" because he was an addicted felon, among other things.  But

> [a] reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court.  Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed.2d 646 (1983).  It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. Neal v. Morris, 972 F.2d 675, 679 (6th Cir. 1992).  An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims.  Gall v. Parker, 231 F.3d 265, 286 (6th Cir. 2000).

Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003).

A rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that petitioner shot the victim.  The mere existence of sufficient evidence defeats petitioner's claim.  Id. at 788-89.

Even if the Court had concluded that the evidence was insufficient, the state appellate court's conclusion – that there was abundant admissible evidence showing that petitioner shot the victim – was objectively reasonable, and the Court must defer to that conclusion.  Moreland v. Bradshaw, 699 F.3d at 917.  Petitioner therefore is not entitled to relief on the basis of his challenge to the sufficiency of the evidence adduced at trial.

**B.  The Prosecutor's Conduct**

The second and sixth habeas claims allege prosecutorial misconduct. The Michigan Court of Appeals determined that none of petitioner's claims about the prosecutor deprived him of a fair trial.

-14-

On habeas review, "[c]laims of prosecutorial misconduct are reviewed deferentially." Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004) (citing Bowling v. Parker, 344 F.3d 487, 512 (6th Cir. 2003)).  A reviewing court may grant relief only when the prosecutor infringes on specific provisions of the Bill of Rights or infects the trial with such unfairness as to make the resulting conviction a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  To prevail on his claim, petitioner must show that the prosecutor's conduct was so egregious "as to render the entire trial fundamentally unfair." Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir. 1979). Federal courts in this Circuit

> apply a "two-part test to determine whether the state court reasonably applied the federal standard in holding that prosecutorial misconduct did not render [the petitioner's] trial fundamentally unfair." Irick v. Bell, 565 F.3d 315, 324 (6th Cir. 2009).  [Courts] first determine whether the prosecution's conduct was improper. Id.  Second, [courts] determine whether that improper conduct was flagrant by considering four factors: "(1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." Id. (internal quotation marks omitted).

Wogenstahl v. Mitchell, 668 F.3d 307, 328 (6th Cir.), cert. denied, __ U.S. __, 133 S. Ct. 311 (2012).

**1.  Lakea Greene's Letter**

Petitioner claims that the prosecutor's questions to defense witness Patricia Crenshaw and the prosecutor's closing argument about Ms. Crenshaw were improper. The questions and argument concerned Ms. Crenshaw's daughter, Gloria Pettiford, who testified for the defense that she and her mother went to petitioner's house at 11:30 a.m. on the day of the shooting.  Ms. Pettiford testified that she talked with petitioner

about twenty minutes and that the two of them left the house about 12:10 p.m. to go to a restaurant on the west side of Detroit.  She claimed that she dropped petitioner off at his home about 1:40 p.m. that day.  (Trial Tr. Vol. VI, 123-32, July 31, 2006.)

Ms. Crenshaw subsequently testified about the same incident.  She explained on direct examination by defense counsel that she went to petitioner's house with her daughter (Gloria Pettiford) on the day of the shooting and that, about noon, petitioner got in her daughter's car and rode away with Gloria.  (Trial Tr. Vol. VIII, 5-13, Aug. 2, 2006.)  On cross-examination, the prosecutor asked Ms. Crenshaw whether her daughter was a truthful person.  Ms. Crenshaw responded, "I know she is."  The prosecutor then asked Ms. Crenshaw whether her opinion of her daughter's truthfulness would change if she knew that someone else (Lakea Greene) had written a letter informing the trial judge that she (the letter writer) was with petitioner at the time of the crime.  Ms. Crenshaw responded that whoever said that was lying.  (Id. at 19-24.)

In her closing argument, the prosecutor said:

He [petitioner] thinks he can get out of anything he does and Gloria Pettiford, you know, I mean, you don't want bad things to happen to your family, but do you honestly believe – do you honestly believe that she waited until two weeks before the trial to say, hey, I was with him?

Come on.  That just doesn't make a lick of sense.  Similarly, her mother [Ms. Crenshaw], she's so sure – even though she wasn't there – that he didn't do it.  She knows.  She knows her daughter always tells the truth.  It's impossible.  It's impossible that anybody else wrote a letter and said something different because she knows.

Well, you know, you have to wonder about people that know everything and want to blurt out whatever they can.  Are they trying to tell the truth of are they trying to push an agenda.  Use your common sense.  That's the most important thing I can ask of you.  Thank you.

(Id. at 84-85.)

-16-

### a.  Asking about Another Witness's Credibility

Petitioner claims that it was improper for the prosecutor to ask Ms. Crenshaw whether her daughter was a truthful person.  The Michigan Court of Appeals agreed that the prosecutor's question was inappropriate and that the prosecutor engaged in misconduct when she elicited Ms. Crenshaw's view that her daughter was a truthful person.  The Court of Appeals nevertheless opined that the impropriety was harmless.

"[A]sking one witness whether another [witness] is lying is inappropriate" because "[s]uch questions invade the province of the jury and force a witness to testify as to something he cannot know, i.e., whether another [witness] is intentionally seeking to mislead the [trier of fact]."  United States v. Harris, 471 F.3d 507, 511 (3d Cir. 2006).  Such questions also force witnesses to "undermine their own testimony or essentially accuse another witness of being a liar."  Id.

Nevertheless, the Supreme Court has never ruled on the issue, id. at 512, and the trial court instructed the jurors that it was their job to decide who was telling the truth.  (Trial  Tr. Vol. VIII, 123, Aug. 2, 2006.)  The prosecutor's questions were not so egregious as to render petitioner's trial fundamentally unfair.

And even though the prosecutor implied in her closing argument that Ms. Crenshaw was not a credible witness, the prosecutor's argument was a fair comment on the evidence.  The prosecutor was entitled to "highlight inconsistencies or inadequacies in the defense, and [to] forcefully assert reasonable inferences from the evidence."  United States v. Lawrence, __ F.3d __, __, No. 06-4105, 2013 WL 5716133, at *40 (6th Cir. Oct. 22, 2013) (citing Bates v. Bell, 402 F.3d 635, 646 (6th Cir. 2005)).  The Court therefore rejects petitioner's argument about the prosecutor's questions to Ms.

Crenshaw regarding her daughter's credibility and the prosecutor's closing comments about Ms. Crenshaw.  The state appellate court's conclusion that the questions and comments did not deprive petitioner of a fair trial was objectively reasonable.

### b.  The Confrontation Clause

In a related argument, petitioner claims that the prosecutor's reference to Lakea Greene's letter deprived him of due process and his right to confront the witnesses against him because Ms. Greene did not testify at trial.  The Michigan Court of Appeals stated that there was no confrontation violation because the trial court permitted the prosecutor to inquire about Ms. Green's letter for impeachment purposes and not for the truth of the matter.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees defendants in criminal prosecutions the right to be confronted with the witnesses against them.  U.S. CONST. amend. VI; Idaho v. Wright, 497 U.S. 805, 813 (1990).  The Clause "contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."  Giles v. California, 554 U.S. 353, 358 (2008) (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)).  The term "testimonial" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  Crawford v. Washington, 541 U.S. at 68.  The Confrontation Clause is not implicated by nontestimonial evidence, Whorton v. Bockting, 549 U.S. 406, 420 (2007); Davis v. Washington, 547 U.S. 813, 821 (2006), and the Clause is not violated when evidence is

-18-

used for some purpose other than to prove the truth of the matter.  <u>Crawford v.
Washington</u>, 541 U.S. at 59 n. 9 (citing <u>Tennessee v. Street</u>, 471 U.S. 409, 414 (1985)).

Whether Ms. Greene's letter to the trial court was testimonial evidence is
questionable.  Even if it were testimonial, the prosecutor did not use the letter to prove
the truth of the matter asserted, namely, that petitioner was with Ms. Greene at the time
of the crime.  Instead, the prosecutor used the letter to suggest that Ms. Crenshaw was
not being truthful when she testified that petitioner was with her daughter at the time of
the crime.  Because the letter was not used to prove the truth of the matter, the
Confrontation Clause was not implicated.

Petitioner nevertheless claims that the prosecutor misrepresented the content of
the letter to the jury.  The letter states that, at the time of the crime, petitioner and Ms.
Green were at one of petitioner's properties.  <u>See</u> Habeas Pet., Ex. C.  Petitioner claims
that this was consistent with Gloria Pettiford's testimony that she and petitioner met at
petitioner's house on Rosedale and that petitioner owned houses on that street.
Ms. Pettiford, however, claimed that only she and her mother were talking with
petitioner at his house on Rosedale and that only she and petitioner subsequently left to
go to a restaurant.  This is inconsistent with Ms. Greene's letter that, at the same time,
she was present with petitioner at one of his properties.  The Court therefore rejects
petitioner's claim that the prosecutor misrepresented the content of Ms. Greene's letter.

### 2.  Misrepresenting Evidence

At the preliminary examination in this case, the state district court informed the
audience at the preliminary examination that "neither witnesses or friends or family from
the decedent or the defendant, friends or family need to have contact with [Browning]."

-19-

(Prelim. Examination Tr., 92, Jan. 3, 2006.)   At trial, the prosecutor asked Yolanda

Browning whether the state district court judge had instructed her at the preliminary

examination not to have any contact with the victim's or petitioner's friends or family.

(Trial Tr. Vol. IV, 43-44, 76-77, July 20, 2006.)  Petitioner alleges that this question was

improper and misrepresented the evidence, because the district court's order was

directed to the victim's or petitioner's friends and family, not Ms. Browning.  The

Michigan Court of Appeals, however, concluded from the record that the prosecutor did

not misrepresent the district court's warning and that no prosecutorial misconduct

occurred.

      Ms. Browning was acquainted with both petitioner and the victim, and a

reasonable inference from the state district court's order was that Ms. Browning should

have no contact with the victim's or petitioner's friends and family.  Thus, the prosecutor

did not misrepresent the evidence.  Even if she did, it is unlikely that the prosecutor's

questions to Ms. Browning prejudiced the defense, given the substantial amount of

evidence against petitioner, including evidence that he and Ms. Cowan tried to

manipulate Ms. Browning.  The Court therefore concludes that any impropriety in the

prosecutor's question about the state district court's order was not flagrant.

### 3.  The Reference to Petitioner's Silence

      Petitioner alleges that the prosecutor violated his right to remain silent by

referring to his alibi defense during closing arguments and stating that he never said

anything in his telephone calls from jail about being with Gloria Pettiford when the

shooting occurred.  The Michigan Court of Appeals determined that the prosecutor's

comment infringed on petitioner's constitutional right to remain silent, but that the error

did not deprive petitioner of a fair trial, given the brief and isolated nature of the improper reference and the trial court's jury instructions.

### a. Legal Standard

"[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids . . . comment by the prosecution on the accused's silence . . . ." Griffin v. California, 380 U.S. 609, 615 (1965). Thus, "[t]he prosecution's use of a defendant's exercise of his constitutional rights against him may amount to prosecutorial misconduct. United States v. Lawrence, 2013 WL 5716133, at *38 (citing Griffin v. California, 380 U.S. at 615). "On the other hand, a prosecutor can make a fair response to a claim made by the defendant or his counsel." Id. (citing United States v. Robinson, 485 U.S. 25, 32 (1988) (stating that "where . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege" against compulsory self-incrimination).

When a constitutional error does occur, the standard for determining whether habeas relief must be granted is whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

### b. Application

The challenged remarks in this case were made during the prosecutor's rebuttal argument. She said:

> The last thing I want to leave with you is this. You never, ever, ever
> - speaking of this alibi defense you'll hear in those [taped calls from jail]
> Mr. Pettiford say, that's not true. That can't be true. I wasn't there. I was

-21-

with Gloria at the Coney Island and you didn't hear that cause it's a lie and it's a lie that was made up about two weeks ago --

(Trial Tr. Vol. VIII, 117, Aug. 2, 2006.)

The defense attorneys objected to the remarks as being improper, and the trial court stated, "Obviously we are arguing that he has a right to remain silent."  (Id. at 118.)  The prosecutor immediately responded,

> He does, absolutely.  He does, absolutely.
>
> . . . .
>
> He does have a right to remain silent.  Unfortunately he didn't have the good sense to remain silent when he was talking on the phone and all those times he talked about getting that affidavit and to hear him say, I wasn't even there. I was at the Coney Island, that's not where he was.

(Id.)

Defense counsel objected to these remarks, as well, and the trial court sustained the objection.  The prosecutor then concluded her remarks and urged the jurors to find petitioner guilty and to hold him responsible for what he did.  (Id. at 119.)

Although the prosecutor's remarks were deliberately made, she conceded that petitioner had a right to remain silent, and the trial court subsequently instructed the jurors that petitioner was presumed innocent, that he was not required to prove his innocence or do anything, and that he had an absolute right not to testify.  The trial court also stated that the jurors should not let petitioner's failure to testify affect their verdict, and when the court asked for a show of hands to determine whether the jurors understood that principle, all the jurors raised their hands.  (Id. at 120-22.)  The trial court went on to say that the jurors should base their decision only on the evidence presented in court and that the attorneys' arguments were not evidence.  (Id. at 122-23.)

-22-

The trial court also stated that the prosecution was required to prove beyond a reasonable doubt that petitioner was actually present when the crime was committed and that petitioner did not have to prove he was elsewhere.  The court explained that, if the jurors had a reasonable doubt about whether petitioner was actually present when the crime occurred, they should find him not guilty.  The court then asked for another show of hands if the jurors understood the alibi defense, and all the jurors raised their hands.  (Id. at 135-36.)

Jurors are presumed to follow their instructions, Richardson v. Marsh, 481 U.S. 200,  211 (1987), and, given the trial court's thorough jury instructions on petitioner's alibi defense and right to remain silent, the likelihood that the prosecutor's comment had a substantial and injurious effect on the jurors' verdict is minimal.  Thus, the state appellate court's conclusion that the alleged error was harmless was not contrary to, or an unreasonable application of, Brecht v. Abrahamson, and petitioner has no right to relief on his claim.

### 4.  The Comment on Yolanda Browning's Statement to the Police

The prosecutor stated during closing arguments that Yolanda Browning provided a police investigator with a very specific reason why she believed petitioner shot the victim.  (Trial Tr. Vol. VIII, 71, Aug. 2, 2006.)  Because Ms. Browning's statement to the investigator was not admitted in evidence, petitioner claims that the prosecutor's comment was improper.

The prosecutor's argument was based on the trial testimony, including Ms. Browning's testimony that she informed the investigator of a specific problem that existed between petitioner and the victim. (Trial Tr. Vol. IV, 168, July 20, 2006.)  Officer Myron Love confirmed that Ms. Browning gave him a specific reason why she thought petitioner may have shot the victim.  (Trial Tr. Vol. V, 21, July 28, 2006).  And Officer Scott Shea testified that Ms. Browning had said petitioner may have shot the victim because of something that happened in the past.  (Id. at 38).  The prosecutor did not reveal the specific reason why Ms. Browning believed petitioner shot the victim, and because her comment about Ms. Browning's statement was based on the evidence, the argument was proper.

### 5.  Violating the Trial Court's Ruling

On the third day of trial, petitioner moved to preclude the prosecutor from eliciting hearsay testimony from a court security officer (Lora Baldwin) regarding what Crystal Cowan said to Yolanda Browning after Ms. Browning testified at the preliminary examination.  The trial court ruled that the parties should approach the bench before attempting to elicit any hearsay from Officer Baldwin regarding what Crystal Cowan had

-24-

said.  (Trial Tr. Vol. III, 189-91, July 19, 2006.)

Court security officer Lora Baldwin testified two days later.  The prosecutor asked Officer Baldwin what Baldwin had reported to the prosecutor at the preliminary examination.  Before defense counsel could object, Officer Baldwin testified that a light-skinned lady, whom she subsequently learned was Crystal Cowan, had walked up to Ms. Browning after Browning testified and asked Browning "did she tell anything." Defense counsel objected to this testimony, and the trial court sustained the objection. The prosecutor then elicited additional testimony that Browning had responded to Ms. Cowan by saying, "No, I didn't tell them anything."  (Trial Tr. Vol. V, 85-88, July 28, 2006.)

Petitioner claims that the prosecutor's questions to Officer Baldwin violated the trial court's ruling to approach the bench before eliciting any hearsay testimony regarding what Crystal Cowan said to Yolanda Browning.  Petitioner maintains that the prosecutor should have confined her question to what Officer Baldwin observed instead of asking Baldwin to testify about what Crystal Cowan said to Yolanda Browning at the preliminary examination.

At least one federal appellate court has determined that "[i]mproper prosecutorial conduct . . . includes violating a court's instruction . . . ."  United States v. Phillips, 200 F. App'x 609, 612 (7th Cir. 2006).  But there was other evidence that petitioner and his girlfriend had tried to tamper with witnesses, and the evidence against petitioner was substantial.  The Court therefore finds that the prosecutor's questions to Officer Baldwin were not so egregious as to render petitioner's trial fundamentally unfair.

For all the reasons given above, the Court concludes that petitioner's

prosecutorial-misconduct claims lack merit.  The state appellate court's conclusion that none of the prosecutor's actions deprived petitioner of a fair trial was not contrary to, or an unreasonable application of, Donnelly v. DeChristoforo.

## C. Counsel of Choice

Petitioner contends that the state trial court deprived him of his constitutional right to counsel of choice by refusing to discharge attorney David Cripps even though petitioner hired Cripps' partner, Gabi Silver.  Petitioner also contends that the trial court deprived him of his right to due process by not making an adequate inquiry into his reasons for wanting to discharge Mr. Cripps.  The Michigan Court of Appeals rejected this claim, stating  that it detected nothing in the record to suggest that petitioner was forced to proceed to trial without the attorney he hired.

### 1.  Clearly Established Federal Law

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant in a criminal case the right to the assistance of counsel in his or her defense.  Faretta v. California, 422 U.S. 806, 807 (1975).  "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."  United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006).  "A choice-of-counsel violation occurs whenever the defendant's choice is wrongfully denied," id. at 150 (emphasis in original), but the right "is circumscribed in several important respects," id. at 144.  A defendant may not demand that a court honor his or her waiver of conflict-free representation, and trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the

demands of its calendar." Id. at 151-52 (citations omitted).  Trial courts also have "an

'independent interest in ensuring that criminal trials are conducted within the ethical

standards of the profession and that legal proceedings appear fair to all who observe

them.'"  Id., at 152 (quoting Wheat v. United States, 486 U.S. 153, 160 (1988)).

>            When reviewing a trial court's denial of a motion to substitute
> counsel, [courts] consider four factors:
>
> >          (1) the timeliness of the motion, (2) the adequacy of the
> > court's inquiry into the matter, (3) the extent of the conflict
> > between the attorney and client and whether it was so great
> > that it resulted in a total lack of communication preventing an
> > adequate defense, and (4) the balancing of these factors
> > with the public's interest in the prompt and efficient
> > administration of justice.
>
> United States v. Vasquez, 560 F.3d 461, 466 (6th Cir. 2009).  If the
> defendant's motion would "necessitate a last-minute continuance, the trial
> judge's actions are entitled to extraordinary deference."  Id. at 467.

Henness v. Bagley, 644 F.3d 308, 321 (6th Cir. 2011), cert. denied, __ U.S. __, 132 S.

Ct. 1970 (2012).

### 2.  Application

At a hearing held four days before trial, Mr. Cripps stated that he and Ms. Silver

were co-counsel in petitioner's case and that there was an issue as to whether

petitioner still wanted them to represent him.  In response, the trial court asked

petitioner whether he wanted Mr. Cripps and Ms. Silver to represent him.  Petitioner

answered, "To my understanding I had (sic) hired Miss Silver and I have never seen her

come."  (Hr'g Tr., 4-5, July 13, 2006.)

At a subsequent point in the hearing, petitioner repeated that he hired Ms. Silver,

that he had not seen his attorneys since hiring Ms. Silver, and that he had not seen Ms.

-27-

Silver prepare for trial.  The trial court declined to adjourn the trial and stated that petitioner would be going forward with counsel as planned.  (Id. at 8-9.)

Both Mr. Cripps and Ms. Silver represented petitioner at trial, and petitioner did not complain about being represented by them.  At the post-conviction hearing, however, he testified that he had wanted only Ms. Silver to represent him.  (Evidentiary Hr'g Tr., 111, June 6, 2008.)  Mr. Cripps and Ms. Silver testified to the contrary. According to them, petitioner expressed a desire to have a female attorney, but they had explained to him that both of them would be representing him.  They maintained that petitioner never told them he did not want Mr. Cripps to represent him.  (Id. at 45-46 (Mr. Cripps' testimony); Evid. Hr'g Tr., 17-18, 49, June 5, 2008 (Ms. Silver's testimony) and 67-68 (Mr. Cripps' testimony.))  Mr. Cripps testified that he would not have appeared as co-counsel if petitioner had asked Cripps to withdraw his representation. (Evidentiary Hr'g Tr. 45-46, June 6, 2008.)

The record, as summarized in the preceding paragraphs, belies petitioner's assertion that he was denied his constitutional right to counsel of choice.  Ms. Silver represented petitioner throughout his trial, along with Mr. Cripps.  And, when given an opportunity to be heard on the issue, petitioner never said that he did not want Mr. Cripps to represent him.

Petitioner points out that, at the hearing on July 13, 2006, the court and the attorneys had a side bar before petitioner entered the courtroom and that the court apparently made a decision during the side bar not to allow Mr. Cripps or Ms. Silver to withdraw from the case.  (Hr'g Tr., 7, July 13, 2006).  But the trial court subsequently asked petitioner at the hearing whether he wanted Mr. Cripps and Ms. Silver to

-28-

represent him.  Petitioner skirted the issue by stating that he hired Ms. Silver and that
his attorneys had not visited him until the 69th day of an 80-day adjournment.  He did
not say that he wanted Mr. Cripps to withdraw from the case.  The focus of his
complaint was that his attorneys had not visited him and did not appear to be prepared
for trial.

Mr. Cripps and Ms. Silver were the third and fourth attorneys to represent
petitioner, and it does not appear from the record that the conflict between them and
petitioner was so great as to result in a total lack of communication.  The trial court,
moreover, stated at the pretrial hearing that the trial had been adjourned in the past to
allow petitioner to hire counsel and that the court had a duty to see that justice was not
thwarted or impeded due to deliberate attempts to stall the process.  Under the
circumstances, the trial court's decision to require petitioner to proceed with Mr. Cripps
and Ms. Silver did not deprive petitioner of his constitutional right to counsel of choice.
And the state appellate court's decision – that no due process violation occurred and
that petitioner's claim lacked merit – was not contrary to, or an unreasonable application
of, Supreme Court precedent.

## D.  The Trial Court's Comments

Petitioner alleges that the trial court's comments during defense counsel's direct
examination of defense witness Patricia Crenshaw deprived him of due process and a
fair trial.  The Michigan Court of Appeals determined on review of this claim that the trial
court was merely exercising its broad discretion to control the trial proceedings by
reminding defense counsel to adhere to the relevant facts.  According to the Court of
Appeals, nothing in the transcript suggested that the trial court intended to criticize or

demean Crenshaw and, therefore, the trial court did not abuse its discretion or pierce the veil of judicial impartiality by limiting the direct examination of Ms. Crenshaw.

### 1.  Clearly Established Federal Law

The Supreme Court explained in <u>Quercia v. United States</u>, 289 U.S. 466 (1933), that a trial judge "is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law."  <u>Id</u>. at 469 (citing <u>Herron v. Southern Pacific Co</u>., 283 U.S. 91, 95 (1931)).  "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).  They can do so "if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  <u>Id</u>.  In other words,

> "[j]udicial misconduct is found where the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties."  <u>United States v. Blood</u>, 435 F.3d 612, 629 (6th Cir. 2006) (citations and internal quotation marks omitted).  Even sarcastic comments which "could have been phrased more diplomatically" do not amount to misconduct when they "primarily evidence the judge's effort to seek additional information from witnesses and not any prejudice or bias."  <u>Id</u>.; <u>see</u> <u>United States v. Powers</u>, 500 F.3d 500, 511 (6th Cir. 2007) ("A trial court judge . . . may interject himself into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence or aid in its orderly presentation.").

<u>Ross</u>, 703 F.3d at 878.

### 2.  Application

The alleged judicial misconduct in this case occurred during defense counsel's direct examination of Patricia Crenshaw.  When defense counsel asked Ms. Crenshaw

-30-

how she could remember November 1, 2005 (the date of shooting), Ms. Crenshaw responded that she had been trying to convince as many black people as possible to go and see Rosa Parks.  The prosecutor objected on grounds that the comment was inappropriate.  The trial court apparently agreed and said,

> We're not going there, Mr. Cripps.  Ask her exactly the date and time –
>
> . . . .
>
> I see it long before it gets there.  We're not going to go on that. Just say you went over to somebody's house to do something.  Go forward.

(Trial Tr. Vol. VIII, 5-6, Aug. 2, 2006.)

Mr. Cripps then asked Ms. Crenshaw what her plan for November 1, 2005, had been.  Ms. Crenshaw answered, "To go see Rosa Parks."  The trial court commented, "That's all she has to say.  . . .  Mr. Cripps, please instruct your witness to answer the question without going onto the dialogue as to why she's doing – ."  Id. at 6-7.

A short time later, the prosecutor objected on the basis that Ms. Crenshaw was saying whatever she wanted to say.  Defense counsel responded by stating that the prosecutor was making speeches.  The trial court then said that Ms. Crenshaw was attempting to do that as well.  The court once again directed defense counsel to move on and to ask Ms. Crenshaw the date and the time, why she was at petitioner's house, and how it related to the case.  The court suggested to defense counsel that he "stick to her seeing Mr. Pettiford" and that they move forward.  (Id. at 8-9.)

Petitioner claims that he was entitled to let the jury know the reason Ms. Crenshaw could recall November 1, 2005, as that was essential to his alibi defense. The record, as summarized above, indicates that he was permitted to do this by asking

-31-

Ms. Crenshaw what her plan for the day was and by eliciting Ms. Crenshaw's response that her plan was to see Rosa Parks. And because the trial court interrupted the proceeding without belittling defense counsel or Ms. Crenshaw, the trial court's comments did not rise to the level of judicial misconduct. The trial court remained impartial while attempting to run a fair and orderly trial.

Moreover, at the close of the case, the trial court informed the jurors that the court's rulings and instructions were not evidence. (Id. at 122.) Whatever negative impact the trial court's conduct may have had on the jury was mitigated by these instructions. United States v. Powers, 500 F.3d at 514 (citing United States v. Johnson, 182 F. App'x. 423, 434 (6th Cir. 2006)).

The trial court's comments were acceptable and did not hamper petitioner's defense in any material way. Consequently, the state appellate court's conclusion – that the trial court's comments were a proper exercise of its broad discretion to control the trial – was objectively reasonable. Petitioner is not entitled to relief on the basis of his claim about the trial court's conduct.

**E.  Alleged Suppression of Evidence**

Petitioner claims that the prosecution suppressed evidence that (1) a police vehicle was present near the gas station when the crime occurred and (2) Sharon Nichols informed the police that Yolanda Browning had said she (Ms. Browning) was not at the gas station during the shooting. "Under Brady [v. Maryland, 373 U.S. 83 (1963)], the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, __ U.S. __, __, 132 S. Ct. 627, 630 (2012).

-32-

Petitioner bears the burden of showing that the prosecution suppressed evidence. Bell v. Howes, 703 F.3d 848, 853 (6th Cir. 2012) (citing United States v. Warshak, 631 F.3d 266, 300 (6th Cir. 2010)), cert. denied, __ U.S. __, 133 S. Ct. 2775 (2013). To state a true Brady violation, he must demonstrate that (1) the evidence at issue was favorable to him, either because it was exculpatory or impeaching, (2) the State suppressed the evidence, either willfully or inadvertently, and (3) prejudice ensued. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "So long as favorable evidence could very well affect the jury's decision, prosecutors must disclose it. And when they fail to do so, courts have a duty to order a retrial, allowing a jury to consider the previously concealed evidence." United States v. Tavera, 719 F.3d 705, 708 (6th Cir. 2013).

### 1. The Police Vehicle

Petitioner alleges that the prosecution suppressed evidence that a police car was present at or near the gas station during the shooting. The Michigan Court of Appeals rejected this claim because petitioner supplied no supporting evidence tending to establish that there was a police officer present during the shooting. The Court of Appeals also was not persuaded that the suppressed evidence was exculpatory.

Prosecution witness Ladona Morrow and her then-thirteen-year-old student Taylor Hanserd both testified at trial that they saw a police car at or next to the gas station and that the car drove away after the shooting. (Trial Tr. Vol. II, 40, 58, 75, July 18, 2006 (Ladona Morrow's testimony); id at 99-102 (Taylor Hanserd's testimony)). Ms. Morrow stated that the vehicle looked like a Detroit police car. (Id. at 59, 75.)

The officer in charge, however, testified at trial that he investigated the witnesses'

-33-

allegations and found no record of a vehicle from the Detroit Police Department being near the gas station during the shooting.  (Tr. Vol. V, 134, 155-56, July 28, 2006.) Additionally, Mr. Cripps testified at the post-conviction evidentiary hearing that he was never able to verify the witnesses' allegations about the police car and that he had no reason to believe the police were suppressing evidence.  (Evidentiary Hr'g Tr., 39-44, June 6, 2008.)

Because there is no verifiable evidence that a police vehicle was present during the shooting, petitioner has not shown that evidence was suppressed.  Petitioner also has not shown that the allegedly suppressed evidence was favorable to him and that prejudice ensued as a result of suppressed evidence.  He merely speculates that a police officer witnessed the crime and could have exculpated him.  Petitioner has not satisfied the three elements of a true <u>Brady</u> claim, and the state appellate court's rejection of his claim was not contrary to, or an unreasonable application of, <u>Brady</u>.

### 2.  Ms. Nichols' comments

Petitioner states that the police failed to record Sharon Nichols' comments about Yolanda Browning even though Ms. Nichols twice told the police that Ms. Browning was lying about seeing petitioner shoot the victim.  The Michigan Court of Appeals opined that the allegedly suppressed evidence supplied by Ms. Nichols merely furnished an additional basis on which to impeach Ms. Browning, whose credibility was already shown to be questionable.  Petitioner nevertheless argues that Ms. Nichols' comments were different from the other impeachment evidence and from the inconsistent versions of the facts that Browning provided.  According to petitioner, the evidence was independent evidence from an unbiased third party that Browning never witnessed the

-34-

shooting.

In a post-trial affidavit, Ms. Nichols wrote that, on the day of the shooting, she saw several police cars and asked Ms. Browning what had happened.  According to Ms. Nichols, Ms. Browning went to the gas station after the shooting to find out what had happened.  Ms. Nichols goes on to say in her affidavit that she informed the police that Ms. Browning was lying about being at the gas station when the victim was shot, but no one from the police department or prosecutor's office contacted her even though she was willing to testify at trial.  See Habeas Pet., Ex. D.

At the post-conviction evidentiary hearing, Ms. Nichols testified that the police ignored her when she informed them on two occasions that Ms. Browning was elsewhere during the shooting and was lying to the police about witnessing the shooting.  Ms. Nichols claimed that Ms. Browning went to the gas station after the shooting and did not witness the actual shooting and that Ms. Browning had said she lied to the police because petitioner had mistreated Browning's niece.  (Evidentiary Hr'g Tr., 59-61, 66-67, June 6, 2008.)

Petitioner contends that he could have used Ms. Nichols' undisclosed comments to impeach Ms. Browning's out-of-court statements that he was the shooter.  Although Ms. Nichols' comments may have helped petitioner, he testified at the evidentiary hearing that he informed his attorneys during trial to contact Ms. Nichols.  (Id. at 101, 115.)  He also admitted that, if audiotapes of his telephone calls in jail indicated that he had instructed his girlfriend to tell Ms. Nichols to come forward, he must have said that.  (Id. at 117.)  His testimony indicates that he was aware of Ms. Nichols' potential value as a witness before trial and certainly no later than trial.

-35-

Brady "does not apply to information that is not wholly within the control of the prosecution." Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998).  It  applies only to situations involving "the discovery, after trial of information which had been known to the prosecution but unknown to the defense."  United States v. Agurs, 427 U.S. 97, 103 (1976).  Consequently, "[t]here is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  Coe v. Bell, 161 F.3d at 344 (quotation marks and citations omitted)).

The record indicates that petitioner was aware of the essential facts permitting him to take advantage of Ms. Nichols' comments.  Thus, there is no Brady violation.

**F.  Trial Counsel**

Petitioner contends that his two trial attorneys were ineffective.  The Michigan Court of Appeals adjudicated petitioner's ineffectiveness claims and concluded that his attorneys' performance did not amount to objectively unreasonable conduct that affected the outcome of petitioner's trial.

### 1.  Clearly Established Federal Law

The Constitution "does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ."  Burt v. Titlow, __ S. Ct. __, __, No. 12-414, 2013 WL 5904117, at *7 (U.S. Nov. 5, 2013).  To prevail on his claim, petitioner must show that his attorneys' performance was deficient and that the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Hodges v. Colson, 727 F.3d 517, 541-42 (6th  Cir. 2013).  An attorney's performance is deficient if

"in light of all the circumstances, the identified acts and omissions were outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. at 690. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. And, because of the difficulties inherent in evaluating counsel's conduct from his or her perspective at the time, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

To satisfy the prejudice prong of the Strickland test, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 131 S. Ct. at 792 (quoting Strickland v. Washington, 466 U.S. at 693).

### 2. Failure to Investigate

Petitioner contends that his attorneys should have investigated, interviewed, and presented several witnesses who would have supported his alibi defense. According to petitioner, the witnesses could have provided exculpatory evidence that he did not fit the

description of the shooter, that Yolanda Browning was not present during the shooting, and that Ms. Browning informed certain individuals she did not observe the shooting.

Attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. at 691.  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." Towns v. Smith, 395 F.3d 251, 258 (6th Cir. 2005).  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000) (citing Strickland v. Washington, 466 U.S. at 688); see also English v. Romanowski, 602 F.3d 714, 726 (6th Cir. 2010) ("The focus in failure-to-investigate claims, then, is the reasonableness of the investigation (or lack thereof)."  Attorneys "may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383 (2005).  The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).  For the reasons given below, the Court finds that the choices made by petitioner's attorneys were reasonable.

### a. Joycee Brenda Riley

Petitioner claims that his attorneys should have produced Joycee Brenda Riley, who described the shooter to the police as 5'7" tall.  See Habeas Pet., Ex. E.  Because petitioner apparently is several inches taller, he claims that Ms. Riley could have provided exculpatory testimony.  Sergeant Gerald Williams, however, testified at trial that Ms. Riley gave a bogus address in her statement to the police and that he was

-38-

unable to locate her.  (Trial Tr., Vol. V, 143-44, July 28, 2006.)

Ms. Silver testified at the post-conviction evidentiary hearing that the information
she had about Ms. Riley was redacted.  She relied on the police to find Ms. Riley
because Riley was an endorsed witness.  (Evidentiary Hr'g Tr., 53-54, June 5, 2008.)
Mr. Cripps provided similar testimony at the evidentiary hearing.  (Evidentiary Hr'g Tr.,
47-48, June 6, 2008.)  He added that they had been very cautious about whom they
called as witnesses, because sometimes a witness who misjudges a suspect's height
and complexion later identifies the suspect in court.  The defense attorneys were
concerned about that happening in this case.  (Id. at 16.)

The Michigan Court of Appeals reasonably concluded that petitioner's attorneys
were aware "of Riley's potential testimony and reasonably relied on the prosecution,
who had endorsed Riley as a trial witness, to work with the police in presenting Riley at
trial."  Pettiford, 2009 WL 529211, at *17.  The Michigan Court of Appeals also
reasonably concluded that defense counsel's allegedly deficient performance did not
prejudice the defense, because eyewitness discrepancies in personal characteristics
routinely vary and Ms. Riley's description of the shooter's height had no tendency to
undermine Ms. Browning's and Thomas Hill's testimony implicating petitioner.

### b.  Nneka Burns

Nneka Burns was a juvenile who informed the police that the shooter was "kind
of light-skinned."  See Habeas Pet., Ex. F, page 2.  Petitioner says that he is dark-
skinned and that his attorneys should have produced Ms. Burns to show he was not the
shooter.

Sergeant Gerald Williams testified at trial that the police were unable to locate

Ms. Burns or her mother at the address provided to the police. (Trial Tr. Vol. V, 143, July 28, 2006.) This was confirmed at the post-conviction evidentiary hearing when Ms. Silver testified that, although the defense team wanted to use Ms. Burns as a witness, they could not locate her. (Evidentiary Hr'g Tr., 30-31, 60, June 5, 2008.) Identifying information about Ms. Burns was redacted from her witness statement due to allegations that petitioner was intimidating witnesses. (Id. at 32.)

Mr. Cripps testified at the hearing that the defense investigator tried to locate Ms. Burns, but was unsuccessful and that Ms. Burns' mother was adamant about not having her daughter brought to court. (Evidentiary Hr'g Tr., 8, June 6, 2008.) Mr. Cripps thought there may have been other issues in Ms. Burns' statement that weighed in favor of not calling her as a witness. In other words, the witness may have hurt the defense more than helped it. (Evidentiary Hr'g Tr., 73, June 5, 2008.) One concern they had was that Ms. Burns would identify petitioner in court even though she had described the suspect as light-skinned. (Evidentiary Hr'g Tr., 16, June 6, 2008.)

The Michigan Court of Appeals reasonably concluded that the defense attorneys were not ineffective for relying on the prosecutor and the police to produce an endorsed witness such as Burns because they had no contact information about Burns. The Court of Appeals also reasonably concluded that the outcome of the trial would not have changed had counsel produced Burns, because her observation about the suspect's skin tone was a minor discrepancy in the evidence and in all likelihood would not have cast doubt on the most incriminating, and properly introduced, evidence against petitioner.

### c. Lorietta Robinson

On July 9, 2007, Lorietta Robinson signed an affidavit stating that she called petitioner on the telephone from the crime scene while the victim was still lying on the ground and that petitioner had said he was with his people (family). She could hear petitioner's cousin Gloria talking in the background while she spoke with petitioner over the telephone. A number of days later, Yolanda Browning called her and said that she did not see the shooting. She (Ms. Robinson) was willing to testify about these events, but no one contacted her. See Habeas Pet., Ex. G.

Ms. Robinson gave a similar account at the evidentiary hearing. (Evidentiary Hr'g Tr., 74-82, June 6, 2008). Petitioner testified at the evidentiary hearing that he had informed his attorneys about Ms. Robinson and that he had wanted her to be a witness. (Id. at 98-99, 112-13).

Ms. Silver, however, testified at the hearing that she could not recall petitioner stating that he wanted her to produce Ms. Robinson as an alibi witness. (Evidentiary Hr'g Tr., 52, June 5, 2008.) Mr. Cripps also testified that petitioner never indicated that he wanted Ms. Robinson to testify. (Evidentiary Hr'g Tr., 50, June 6, 2008). At a different point in the hearing, Mr. Cripps testified that he thought Ms. Robinson had given a false address (Id. at 13.)

Ms. Robinson explained at the evidentiary hearing that she had been subpoenaed to appear at trial, but was later told that the proceeding was canceled. Although her address changed after the trial commenced, she never contacted the prosecution or petitioner's trial attorneys. And even though her mother (Betty Fair) testified at trial and knew where to find Ms. Robinson, she did not speak with her mother until after petitioner was convicted. (Id. at 83-87.)

-41-

Even assuming that the defense attorneys were aware of Ms. Robinson, they were not ineffective for failing to call Robinson because she apparently could not be located.  The Michigan Court of Appeals reasonably concluded that the defense attorneys' failure to produce Ms. Robinson did not amount to deficient performance.

### d.  Sharon Nichols

Sharon Nichols signed an affidavit on May 26, 2007, stating that she knew Yolanda Browning was lying about having witnessed the shooting.  She reached this conclusion after Ms. Browning asked her what happened at the gas station and then walked to the gas station to find out what had occurred there.  Ms. Nichols further states in her affidavit that she informed the police about Ms. Browning not being at the gas station when the victim was shot, but the officers told her that they had no reason to call her as a witness, and no one else contacted her.  See Habeas Pet., Ex. D.

Ms. Nichols testified similarly at the subsequent evidentiary hearing in state court.  She claimed that she twice informed a police officer that Ms. Browning was lying, but the police officer never took a statement from her, and the officer acted as though what she said did not matter.  (Evidentiary Hr'g Tr., 56-61, June 6, 2008.)  Ms. Nichols also testified that Ms. Browning never said petitioner shot the victim, that Ms. Browning "lies about everything," and that Ms. Browning had implicated petitioner because she was angry about something petitioner did to her cousin.  (Id. at 65-67.)

This testimony may have helped petitioner at trial, and petitioner testified at the evidentiary hearing that he told his attorneys about Ms. Nichols.  (Id. at 101.)  Ms. Silver, on the other hand, testified at the evidentiary hearing that she could not recall whether petitioner informed her or Mr. Cripps about Ms. Nichols.  (Evidentiary Hr'g Tr.,

-42-

37, 52, June 5, 2008.)  And Mr. Cripps testified that, although Ms. Nichols' name came

up during trial, petitioner did not indicate to him what Ms. Nichols would have said had

she testified.  Additionally, the defense investigator was unsuccessful in locating Ms.

Nichols because the only address they had for her was a street name.  (Evidentiary Hr'g

Tr., 12-13, 50, June 6, 2008.)

Because Ms. Nichols apparently could not be located, the defense attorneys'

failure to call her did not amount to deficient performance.  Even if the attorneys's

performance was deficient, the Michigan Court of Appeals reasonably concluded that

any evidentiary value in Ms. Nichols' recollections was diminished substantially by her

admission that she did not know where Ms. Browning was during an interval of twenty-

five to forty minutes when the shooting occurred.  (Id. at 63, 57-58.)

### e.  Amy Youngblood

Amy Youngblood states in an affidavit signed on August 15, 2007, that Ms.

Browning could not have witnessed the shooting because she was getting "high" at an

apartment on the day of the shooting.  See Habeas Pet., Ex. H.  Petitioner testified at

the evidentiary hearing that he told his attorneys about Ms. Youngblood (Evidentiary

Hr'g Tr., 99, June 6, 2008.)  Ms. Silver thought that the defense team had talked to Ms.

Youngblood, but she (Silver) could not remember what Ms. Youngblood had to say.

(Evidentiary Hr'g Tr., 37, June 5, 2008.)  Mr. Cripps, on the other hand, testified that he

thought Ms. Youngblood could not be located.  He also stated that the defense team

had been concerned that some of the witnesses might come into court and identify

petitioner as the shooter.  (Evidentiary Hr'g Tr., 14-15, June 6, 2008.)

The Michigan Court of Appeals determined that Ms. Youngblood had limited

-43-

value to petitioner because she did not specify the time of day that Ms. Browning supposedly was getting "high."  The Court of Appeals reasonably concluded that petitioner's attorneys were not ineffective for failing to locate Ms. Youngblood and that Ms. Youngblood's absence from trial did not deprive him of a substantial defense.

To summarize, the witnesses that petitioner says his attorneys should have investigated, interviewed, and produced either could not be located or may have not have been helpful to the defense and may have hurt the defense more than helped. Thus, the defense attorneys' alleged failure to investigate, interview, and produce witnesses did not constitute deficient performance.  Even if it did, the allegedly deficient performance did not prejudice the defense.  The state court's decision was not contrary to, or an unreasonable application of, Strickland v. Washington.

### 3.  Failure to Present a Substantial Defense

To the extent petitioner is alleging that his attorneys failed in other ways to diligently investigate and present a defense, his claim is not supported by the record. The trial court determined that Ms. Silver was zealous in her representation of petitioner and that both Ms. Silver and Mr. Cripps did what they could to provide a defense for petitioner.

The Michigan Court of Appeals agreed that petitioner's claim of ineffective assistance lacked merit.  In reaching this conclusion, the Court of Appeals pointed out that, according to the testimony of Ms. Silver and Mr. Cripps at the state evidentiary hearing, they commenced their representation of petitioner, with petitioner's blessing, in late April of 2006.  At no point did petitioner advise either of them to withdraw.

Silver and Cripps divided the tasks involved in defendant's representation,

-44-

but maintained regular contact regarding their progress; for example, Silver spent days listening to hundreds of 15-minute recorded phone conversations initiated by defendant while in jail, and in the meantime Cripps met with defendant on multiple occasions in jail, reviewed discovery materials, and hired an investigator to help seek out several witnesses that defendant desired to present. Cripps and Silver also read the preliminary examination transcript, met with defendant's cousin, a lawyer, and drove by the gas station where the shooting occurred. Cripps testified, "I'm sure [defendant] had a complete copy of discovery because of the fact-I mean, we made multiple copies of the discovery. A relative of [defendant's] I think was ... [a lawyer] and he got repeated copies of discovery materials, some of which he said he was providing to his relative...." Silver recounted that she, Cripps, and defendant had agreed to present an alibi defense on his behalf, and that they successfully filed the notice of alibi in early July 2006, which included Lakea Green's name and four others. Cripps and Silver recalled that they and defendant also discussed (1) testimony from many potential witnesses, several of whom the police ultimately could not locate, as well as "some contradictions of the witnesses that [defendant] wanted us to call as alibi witnesses which [Silver] though was problematic, but ... he wanted the witnesses called and they were going to be called," and (2) other evidence strategies, like investigating whether defendant's cell phone records might place him elsewhere than at the gas station at the time of the shooting on November 1, 2005. Silver and Cripps agreed that they definitely had awareness of the eyewitness testimony that had mentioned a police car near the shooting at the time of the shooting, and that despite "extensive[ ]" discussions with the prosecutor and other consideration of a basis for the eyewitness testimony, they had never encountered any other information to substantiate that the police had engaged in some form of eyewitness or other evidence suppression.

Pettiford, 2009 WL 529211, at *24.

Although petitioner claimed at the evidentiary hearing that his attorneys lied about hiring an investigator, visiting the crime scene, and other things, the record indicates that the attorneys' performance was within the wide range of professionally competent assistance. There is not a substantial likelihood that, but for the claimed errors, the result of the trial would have been different. Thus, the state appellate court's rejection of petitioner's claim was objectively reasonable, and petitioner has no right to

relief on the basis of his claim that his attorneys failed to present a substantial defense.

### 4. Alleged Failure to Properly Challenge Yolanda Browning

Petitioner asserts that his trial attorneys should have impeached Yolanda Browning with conflicting testimony from other witnesses that the shooter left in a green conversion van, that the victim had bullet wounds in his back, which were inflicted before he was found lying on his back, and that the shooting was not done at close range. Petitioner asserts that this evidence contradicted Ms. Browning's testimony that the shooter left in a while Lumina van, that the first gunshot went to the victim's head, and that the shooting was close range.

Ms. Silver did ask Ms. Browning about the white mini van (Trial Tr. Vol. IV, 138, July 20, 2006), and, during closing arguments, she pointed out inconsistencies in Ms. Browning's version of the facts. She noted that Ms. Browning had claimed the shooting was close-range, whereas the medical examiner opined that the shooting was not close range. She also pointed out that Ms. Browning claimed the shooter left in a white van, but no other witness saw a white mini van. (Trial Tr. Vol. VIII, 90-92, Aug. 2, 2006.) Ms. Silver argued that, in light of what other witnesses had said, "You can't believe [Browning], any of her versions. You can't believe anything she says . . . ." (Id. at 91.)

Any deficiencies in defense counsel's cross-examination of Ms. Browning likely did not prejudice the defense, because the key issue at trial was the identity of the shooter, and Ms. Browning's testimony was that she did not see who shot the victim. As Ms. Silver adeptly explained at the evidentiary hearing, she could not impeach Ms. Browning with discrepancies in her testimony because Ms. Browning recanted everything that she initially told the police. (Evidentiary Hr'g Tr., 40-41, June 5, 2008.)

-46-

Although Ms. Browning did implicate petitioner in her statements to the police, pointing out differences between Ms. Browning's statements to the police and the testimony of other witnesses on minor details like the color of the escape vehicle, the location of the bullet wounds, and the distance between the gun and the victim would not have made a difference in the trial.  To her credit, Ms. Silver elicited Ms. Browning's testimony that the police fabricated her statements, that her motive for lying was retaliation for petitioner's abusive relationship with her niece, and that she did not want petitioner to go to prison for something he did not do and something she did not see. (Trial Tr. Vol. IV,  128-29, 139,141, 149, July 20, 2006.)  Defense counsel's cross-examination of Ms. Browning did not fall below an objective standard of reasonableness and did not prejudice the defense.

## 5.  Failure to Object

Petitioner argues that his attorneys should have objected to the prosecutor's conduct and cited the Confrontation Clause when objecting to evidence about Lakea Greene's letter to the trial judge.  The Court concluded above that the prosecutor's conduct did not deprive petitioner of a fair trial.  See, supra, Section III.B.  Therefore, petitioner's attorneys were not ineffective for failing to object to the conduct.  An attorney is not ineffective for failing to make meritless objections.  Hoffner v. Bradshaw, 622 F.3d 487, 509 (6th Cir. 2010).

## 6.  Failure to Consult

Petitioner's final argument about trial counsel is that they did not adequately consult him before trial.  He claims that, at their first meeting on April 10 or 11, 2006, they merely discussed the retainer.  He claims to have seen Mr. Cripps a second time,

when Mr. Cripps returned to say that the retainer was paid and that he would seek a postponement of the trial, and he claims that he saw Ms. Silver only on July 6, 2006.

Attorneys have a duty to consult with their clients on important decisions, including questions of defense strategy.  Florida v. Nixon, 543 U.S. 175, 187 (2004) (citing Strickland v. Washington, 466 U.S. at 688.  Ms. Silver testified at the evidentiary hearing that she could not remember how many times she met with petitioner before trial, but she thought Mr. Cripps met with petitioner a number of times during the week leading up to the trial.  (Evidentiary Hr'g Tr., 20, June 5, 2008.)

Mr. Cripps testified at the hearing that he did not know how many times he visited petitioner, but he knew that he visited him more than one time.  (Id. at 65; Evidentiary Hr'g Tr., 21, June 6, 2008.)[11]  He thought that the biggest obstacle they faced was the audiotapes of petitioner's telephone calls from jail and that the jury's verdict resulted from the audiotapes, which were played for the jury at trial. (Evidentiary Hr'g Tr., 17-18, June 6, 2008.)

Mr. Cripps also testified that his preparation for petitioner's trial entailed doing other things besides visiting petitioner.  For example, he and Ms. Silver looked at discovery materials and listened to audiotapes of petitioner's telephone conversations in jail.  (Id. at 46.)  As noted above, the attorneys did many other things in petitioner's behalf, and petitioner fails to say how additional meetings with his attorneys would have helped him.  The Court therefore finds that the alleged failure to consult with petitioner

---

[11] At the pretrial hearing on July 13, 2006, Mr. Cripps testified that he visited petitioner in jail at least three or four times within the previous two weeks as he prepared for trial.

did not prejudice petitioner's defense.

### 7.  Conclusion on Petitioner's Claims about Trial Counsel

The Michigan Court of  Appeals thoroughly addressed petitioner's ineffective-assistance-of-counsel claims and concluded that none of the many claims concerning counsel's performance amounted to objectively unreasonable conduct that affected the outcome of petitioner's trial.  This Court finds for the reasons given above that the state court's decision was not contrary to, or an unreasonable application of, Strickland v. Washington.  Petitioner therefore has no right to relief on the basis of his claims about trial counsel.

## IV.  Conclusion

The state appellate court's adjudication of petitioner's claims was not so lacking in justification that there was an error beyond any possibility for fairminded disagreement.  Accordingly, the petition for a writ of habeas corpus [Doc. No. 1] is **DENIED**.

## V.  Certificate of Appealability

Before Petitioner may appeal this decision, a district or circuit judge must issue a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El

v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. at 484.

Reasonable jurists would not find the Court's assessment of petitioner's claims debatable or wrong.  Nor would reasonable jurists conclude that petitioner's claims deserve encouragement to proceed further.  The Court therefore declines to grant a certificate of appealability.

Dated:  December 6, 2013

                                   s/George Caram Steeh
                                   GEORGE CARAM STEEH
                                   UNITED STATES DISTRICT JUDGE

| CERTIFICATE OF SERVICE |
| --- |
| Copies of this Order were served upon attorneys of record on December 6, 2013, by electronic and/or ordinary mail. |
| s/Barbara Radke<br>Deputy Clerk |